**In the United States District Court
for the District of Kansas**

———————

No. 20-cv-01158-TC

———————

MICHELLE BRENT,

*Plaintiff*

v.

WALMART, INC.,

*Defendant*

———————

**MEMORANDUM AND ORDER**

Michelle Brent slipped and fell at a Walmart in Topeka, Kansas. She filed this diversity suit for compensatory and punitive damages, alleging that Walmart acted wantonly in failing to maintain a safe environment. Walmart seeks partial summary judgment on Brent's punitive damages claim under Kansas law. Docs. 108 & 109. For the following reasons, Walmart's motion is granted.

**I**

**A**

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim's resolution. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over those material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits

incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(d). To determine whether a genuine issue of fact exists, the Court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record as a whole, *see Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

Furthermore, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). State law governs the availability of punitive damages, *Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1200 (10th Cir. 2012), and the parties agree that Kansas law applies to their dispute, Doc. 110 at ¶ 1.d. Under Kansas law, "the plaintiff shall have the burden of proving, by clear and convincing evidence . . . , that the defendant acted toward the plaintiff" with willful or wanton conduct. K.S.A. § 60-3702(c). While this is a question of fact reserved for a jury, the inquiry on summary judgment is whether plaintiff has submitted evidence that would permit a reasonable jury to find by clear and convincing evidence that the defendant acted with the requisite intent. *See Anderson*, 477 U.S. at 254 (1986); *Danaher v. Wild Oats Markets, Inc.*, 779 F. Supp. 2d 1198, 1213 (D. Kan. 2011) (applying Kansas law).

**B**

On a rainy September day in 2018, Michelle Brent slipped and fell in a Topeka Walmart, at the garden center entrance. Doc. 114 at ¶¶ 1–4. It had stopped raining within the hour before her fall, but the parking lot was still wet. Doc. 119 at ¶¶ 68, 82; *see* Doc. 114-11. In that same hour, several customers entered the garden center from the parking lot and walked over the entrance mat, which was inside the door after a gap of exposed floor. *See* Doc. 114-6. Those customers pushed shopping carts over the mat and paused on it to close their umbrellas. Doc. 119 at ¶¶ 69–73; *see, e.g.*, Doc. 114-8; Doc. 114-9; Doc. 114-10. Brent claims that this traffic added water to the mat and concrete floor. Doc. 114 at ¶ 74. Walmart disputes that the mat and floor were wet. Doc. 109 at ¶ 10; Doc. 119 at ¶ 74. When Brent walked over the mat, she stepped on it with both feet. Doc. 119 at ¶ 87. When she stepped off, her shoe slid, and she fell. *Id.* at ¶ 88.

Brent left the store on a stretcher. Doc. 110 at ¶ 3.a; Doc. 119 at ¶ 90. Less than a minute later, a Walmart maintenance employee, Gary Lundholm, dust mopped over the spot where Brent had fallen, while

Assistant Store Manager Patricia McPherson looked on. Doc. 114 at ¶ 20; Doc. 119 at ¶¶ 91–92, 95. McPherson then photographed the area. Doc. 119 at ¶ 95. The parties dispute whether Lundholm's mopping was a "safety sweep" performed in the ordinary course of business and whether it altered the scene. Doc. 119 at ¶¶ 97, 99.

Walmart greeter Micki Mellott was working the garden center entrance that day. Doc. 114 at ¶ 8. Mellott testified that, before the accident, she noticed water accumulating between the garden center entrance door and the mat on the floor. *Id.* at ¶ 11; Doc. 114-1 at 17–19. She testified that she told cashier Maria Thomas to squeegee the floor because she could not do it herself due to an injury. Doc. 114 at ¶ 13. Walmart and Thomas deny that Mellott asked Thomas to clean the floor. Doc. 109 at ¶ 66; Doc. 109-8 at ¶ 4. Either way, Thomas did not squeegee the floor. Doc. 114 at ¶ 13; Doc. 119 at ¶¶ 78, 84. As for the mat, the parties dispute whether it was wet. According to Walmart, Mellott's testimony is clear: the mat was not wet. Doc. 109 at ¶ 10; Doc. 114-1 at 17. But according to Brent, Mellott's testimony leaves open the possibility that the mat was indeed wet, just not saturated. *See* Doc. 114 at ¶ 10; Doc. 114-1 at 19 ("Q: So that doesn't mean it wasn't wet, does it? A: No. . . ."). Brent also points to Mellott's testimony that she saw water "start to go straight towards the *wet* floor mat." Doc. 114 at ¶ 10 (emphasis added). And both parties agree that just before Brent fell, Mellott "was attempting to warn Plaintiff 'from the wet floor' and the 'wet floor in front of the mat.'" Doc. 119 at ¶ 86 (brackets omitted) (quoting Doc. 114-1 at 17–18).

Although Brent has identified individual managers working at the store that day, it appears that none were specifically aware of water on the floor or of a dangerously wet mat. Doc. 119 at ¶ 66. Nonetheless, Brent claims that management was aware of the garden center entrance's high likelihood of becoming slippery on rainy days and the need for a longer mat. Doc. 114 at ¶ 66, 29. Specifically, Mellott testified that she tried to raise the mat issue in safety meetings but was ignored or interrupted each time. *See* Doc. 109-2 at 96–98. Walmart says that Mellott never actually communicated the potential problem in the safety meetings, but merely *attempted* to without success. *Id.* at ¶ 104. Mellott also told manager Dale Pritchett that a better mat was needed at the Garden Center entrance, to which he responded, "I'll see what I can do." Doc. 119 at ¶ 105.

Walmart maintains policies for dealing with customer accidents and inclement weather. Doc. 114 at ¶¶ 27, 60; Doc. 119-3; Doc. 119-4; Doc. 119-5. For customer accidents, Walmart policy requires store managers to photograph the area. Doc. 114 at ¶ 61; Doc. 119-5. But

3

employees must not alter the site before taking photos. Doc. 114 at ¶ 62; Doc. 119-5 at 2. For bad weather, employees are to place "caution wet floor" cones at each entrance and make umbrella bags available for customers. Doc. 114 at ¶¶ 34, 75; Doc. 119-3 at 1. When needed (*e.g.*, if rain is expected), the policy directs employees to place additional wet area mats at entrances. Doc. 114 at ¶ 28; Doc. 119-3 at 1. Mats must be long enough and positioned in a direction to accommodate customer walking patterns. Doc. 114 at ¶ 29; Doc. 119-3 at 1. The employee placing the mats determines the best position and direction. Doc. 114 at ¶ 32. On the day that Brent fell, there was one caution cone inside the garden center entrance near the lone mat, and there were no umbrella bags. Doc. 114 at ¶¶ 37, 58. Management had instructed Mellott to place multiple caution cones at the garden center entrance, *id.* at ¶ 36; *see* Doc. 119-3, but the employees could not find additional cones, Doc. 114 at ¶ 38.

Brent alleges that the fall caused severe injuries requiring extensive medical care. Doc. 110 at ¶ 3.a. She underwent multiple surgeries on her femur and knee and completed over 100 physical therapy sessions. *Id.* She requires ongoing medical care and a knee brace to walk. *Id.* Brent seeks damages for these medical costs, wage loss, loss of consortium, and other noneconomic damages. Doc. 110 at ¶ 5. In addition, she seeks punitive damages, claiming that Walmart acted wantonly when it violated its own safety policies, attempted to cover up its actions, and ignored repeated warnings about the dangerous entrance. Doc. 110 at ¶ 4.a.[1]

Walmart argues that punitive damages are precluded for two reasons. First, Brent has not provided adequate evidence, of a clear and convincing nature, that Walmart employees acted wantonly. Second, Brent has failed to allege sufficient facts to show that Walmart authorized or ratified the alleged wanton conduct.

## II

Walmart's motion for partial summary judgment is granted. Although Brent has raised a dispute about whether individual employees—some of whom were managers—acted wantonly, she has failed to raise a genuine dispute about whether Walmart itself authorized or ratified any wanton conduct that led to her fall.

---

[1] Brent's suit is against only Walmart; she has not named any individual defendants.

### A

In Kansas, "[p]unitive damages are awarded to punish the wrongdoer for malicious, vindictive, or willful and wanton invasion of another's rights." *Adamson v. Bicknell*, 287 P.3d 274, 280 (Kan. 2012) (citations and internal quotation marks omitted). The "ultimate purpose" of a punitive damages award is not to compensate plaintiffs but rather to restrain and deter others from committing similar wrongs. *Id.*

To recover punitive damages at trial, a plaintiff must establish "by clear and convincing evidence . . . that the defendant acted toward the plaintiff with willful conduct, wanton conduct, fraud or malice." K.S.A. § 60-3702(c); *Reeves v. Carlson*, 969 P.2d 252, 255 (Kan. 1998). Brent alleges only wantonness. Doc. 110 at ¶ 4.a. Wanton conduct "falls between negligent behavior and willful or malicious misconduct." *Adamson*, 287 P.3d at 281. It refers to the mental attitude of the wrongdoer rather than a particular act of negligence. *Reeves*, 969 P.2d at 256. The plaintiff does not need to prove an intent to injure but must show more than a mere lack of due care. *Adamson*, 287 P.3d at 281–82.

Establishing that a defendant acted wantonly is a two-step process. *Adamson*, 287 P.3d at 281. First, a plaintiff must show that the act was performed with a realization of imminent danger. *Id.* This may be established by direct evidence of the defendant's actual knowledge of a dangerous condition. It may also be established by circumstantial evidence of the defendant's reason to believe that his or her act might injure another because that act was taken "in disregard of a high and excessive degree of danger, either known to the defendant or apparent to a reasonable person in the defendant's position." *Wagner v. Live Nation Motor Sports, Inc.*, 586 F.3d 1237, 1244–45 (10th Cir. 2009) (applying Kansas law).

Second, a plaintiff must show that the conduct was performed with reckless disregard or complete indifference to the probable consequences of the act. *Adamson*, 287 P.3d at 281. In other words, "the actor must have *reason to believe* his act may injure another, and commits the act anyway, being indifferent to whether or not it injures another." *Id.* (brackets and citations omitted). Reckless disregard and indifference can also manifest in the failure to act when action is necessary to prevent injury. *Cerretti v. Flint Hills Rural Elec. Co-Op Ass'n*, 837 P.2d 330, 334 Syl. ¶ 8 (Kan. 1992). That said, "a token effort to prevent harmful consequences would not avoid liability" for failure to act, but "definite acts which materially lessen the chances of those consequences would avoid liability." *Wagner*, 586 F.3d at 1245 (brackets

omitted) (quoting *Friesen v. Chi., R. I. & P. R. R.*, 524 P.2d 1141, 1148 (Kan. 1974)). The focus is on whether the precautions materially lessen the chances of harmful consequences from the "*particular* 'dangerous condition'" analyzed under the first prong. *Id.*

**B**

Brent has raised a genuine dispute that at least some Walmart employees acted wantonly in refusing to clean up water at the garden center entrance or otherwise failing to take precautions to prevent injury. For cashier Thomas, the facts—viewed in the light most favorable to the nonmovant—show that the floor and mat were wet and that Thomas refused to clean it even after Mellott notified her. *See* Doc. 114 at ¶¶ 10, 11, 13, 74; Doc. 119 at ¶¶ 74, 78. Although Brent does not allege that Thomas saw the wet floor and mat herself, she does allege that Mellott provided her with knowledge of the situation. Further, Brent alleges that management had instructed Mellott to notify the garden center cashier (that day, Thomas) when cleaning was needed. Thus, what Thomas actually knew, why she refused, and what specific responsibility she had remain sufficiently in dispute under the punitive damages framework. A reasonable jury could conclude by clear and convincing evidence that she was aware of an imminent danger (water pooling at the entrance) and recklessly disregarded it or was indifferent to it ("refused" to clean).

As for the store managers, however, Brent has failed to offer evidence to support her contention that they were "specifically aware of the water pooled at the" entrance on the day of Brent's fall. Doc. 114 at 29. The record contains no facts about individual managers' knowledge of the wet floor—just Thomas and Mellott's.[2] Indeed, it is uncontroverted that no customers or employees told either of the identified managers—Robbie Bradstreet and Patricia McPherson—that there was water on the floor the day that Brent fell. Doc. 114 at ¶ 66; Doc. 119 at ¶ 67. Brent argues that the fact that those managers were not told does not mean they were unaware. But she offers no evidence in support. Conclusory contentions are insufficient for a genuine dispute on summary judgment. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664,

---

[2] Brent has not expressly argued that Mellott's conduct that day was wanton. Understandably so: Mellott took affirmative steps to try to address the problem. She noticed the wet floor, followed protocol in alerting the cashier, and attempted to warn Brent to watch her step.

671–72, 674 (10th Cir. 1998); *Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

Even so, Brent alleges that managers were aware of the "ongoing problem" and that Walmart's current safety practices were "insufficient to allow patrons to fully dry their shoes." Doc. 114 at 29. She cites Mellott's repeated attempts to raise the issue of wet floors and inadequate mats during safety meetings. *See* Doc. 119 at ¶¶ 101, 104–05.[3] Mellott testified that she had previously told management, specifically McPherson, about the dangerous water conditions: "I kept telling Patti [McPherson] whenever I leave to go to break and come back and it's raining like this, I come back to water messes back here, and it's like nobody cleans them up." Doc. 114 at ¶ 66. And even though she told manager Pritchett that a better mat was needed at the garden center entrance, longer mats were not used. Doc. 114 at 28. Brent also claims that Walmart's decision to staff the entrance with a greeter who was physically incapable of cleaning up water on the floor, along with a cashier with a history of refusing to help, amounted to "conscious[] disregard[]" of "an obviously dangerous situation." Doc. 114 at 29. On these facts, it is possible that a reasonable jury could find by clear and convincing evidence that managers only made "token" attempts in abiding by Walmart's safety policies. *See Johnson v. Colt Indus. Operating Corp.*, 797 F.2d 1530, 1537 (10th Cir. 1986) (applying Kansas law) (finding sufficient jury question for punitive damages where plaintiff offered evidence that defendant should have been aware of the risk *and* defendant's steps to address risk could be viewed "as trifling at best."). All told, Brent has raised a genuine dispute as to whether individual employees acted wantonly leading up to her fall.

## C

**1.** Even if a jury could find by clear and convincing evidence that some employees acted wantonly, that only raises the question of whether Walmart itself—the only defendant in this case—can be held liable for punitive damages. In Kansas, punitive damages against a defendant-employer are precluded "unless the questioned conduct was authorized or ratified by a person expressly empowered to do so on

---

[3] Walmart argues that Mellott's testimony only shows that "she actually never reported the issue because every time she tried to raise it in safety meetings someone would cut her off." Doc. 119 at 19–20. But this reads Mellott's testimony too narrowly, *see* Doc. 114-1 at 29–30, and would be inappropriate on summary judgment where facts are viewed in a light favorable to the non-movant.

7

behalf of the employer." K.S.A. § 60-3702(d)(1). This "necessarily refers to a person provided with the express authority to act on behalf of and bind the principal or employer," for example, a managing agent. *Smith v. Printup*, 866 P.2d 985, 1004 (Kan. 1993). It is not enough for Brent to offer evidence that an employee acted wantonly. *Hartford Accident & Indem. Co. v. Am. Red Ball Transit Co.*, 938 P.2d 1281, 1284 Syl. ¶ 11 (Kan. 1997). She must also show that an "expressly empowered" person authorized or ratified the conduct that caused Brent's accident. *Id.* at 1284 Syl. ¶ 10.

Precisely who is a managerial agent within the meaning of the statute is not expressly defined. Nonetheless, case law indicates that ordinary store managers do not automatically fit the bill. For example, in *Lindsey v. Miami Cnty. Nat. Bank*, the plaintiff sought punitive damages from a bank based on conduct during a vehicle repossession by one of its vice presidents who was also a local branch manager. 984 P.2d 719, 721–22 (Kan. 1999). The plaintiff argued that the branch manager was a "management level employee" and therefore more of a principal than an employee or agent when he violated the bank's repossession policies. The Kansas Supreme Court denied the punitive damages claim because the plaintiff had not shown that the branch manager had sufficient authority over repossessions to fall within the meaning of an "expressly empowered" under Section 60-3702(d). *Id.* at 724. The court noted that the statute required authorization or ratification by someone like the senior vice president who was supervisor for all branch managers or the bank's executive vice president and senior lending officer. *Id.*; *see also Walters v. Dollar Gen. Corp.*, No. 19-1010, 2021 WL 463370, at *4 (D. Kan. Feb. 9, 2021) (finding no ratification even where employees reported sidewalk incidents to "corporate department" because of failure to identify a person with express authority to act on behalf of corporation).

Once such a person has been identified, the inquiry turns to whether that person authorized or ratified the questioned conduct. Authorization "may be either express or implied and generally is accomplished before or during the employee's questioned conduct." *Smith*, 866 P.2d at 1003. Ratification may come before, during, or after the questioned conduct and may manifest through actions indicating the approval, sanctioning, or confirmation of the conduct. *Id.* "Ongoing tolerance" of a continuous course of tortious conduct that causes the injury may amount to ratification or authorization. *Id.* at 1007. But the fact that an employee caused a foreseeable injury, alone, is not enough to support a punitive damages claim against an employer. *Stallings v. Werner Enters., Inc.*, 598 F. Supp. 2d 1203, 1215 (D. Kan. 2009). Nor is it sufficient that an employer was negligent or reckless in hiring,

8

supervising, training, or retaining an employee or agent. *Smith*, 866 P.2d at 1000, 1013.

**2.** Brent has not offered evidence that Walmart itself—as employer—authorized or ratified the wanton conduct. As a result, Walmart is entitled to summary judgment on Brent's request for punitive damages.

Brent argues that a reasonable jury could find that Walmart managers authorized or ratified recurring dangerous conditions at the garden center entrance, particularly those that caused her fall. Doc. 114 at 29. She argues that Walmart "gave its employees the authority to decide when or if to clean up water, when or if to shop vac the mats or to call for a replacement mat." Doc. 114 at 31. Likewise, she alleges that Walmart gave its management employees the authority to decide when or if mats were placed at entrances, which mats to use and how to position them, which associates were assigned to work the garden center entrance, and how to respond to safety concerns that employees raised. *Id.* Finally, Brent argues that Lundholm's mopping was a "cover[] up," which demonstrates ratification of the unsafe conduct. *Id.* These facts, according to Brent, indicate that Walmart managers were aware of the dangerous conditions and were empowered to correct them. Their failure, she argues, was "authorization or ratification of the status quo." *Id.*

Yet even if a reasonable jury could find that cashier Thomas or individual managers acted wantonly, there is no evidence that their conduct was authorized or ratified by any member of Walmart's management who was "expressly empowered" to do so. First, the conduct of the individual managers identified by Brent does not automatically mean that Walmart authorized or ratified their conduct simply because they were manager-level employees. *Lindsey*, 984 P.2d at 723. More than a vicarious liability theory is required, yet that is all Brent offers. Second, Brent has not offered evidence that Bradstreet or McPherson or anyone else she identified was "expressly empowered" under the meaning of Section 60-3702(d) to authorize or ratify the conduct that allegedly led to her fall. She merely alleges that they "implicitly authorized or ratified" the conduct, without showing that they themselves were empowered by Walmart to do so. Doc. 114 at 31. If Brent had evidence that "upper management" was aware of and approved or sanctioned the store managers' conduct, this outcome might be different. *Oliphant v. Perkins Rest. Operating Co., L.P.*, No. 94-2022, 1995 WL 7729, at *7 (D. Kan. Jan. 6, 1995), amended sub nom. *Oliphant v. Perkins Rest. Operating Co.*, 885 F. Supp. 1486 (D. Kan. 1995) (permitting punitive damages against restaurant chain because regional manager had

9

knowledge of one of its restaurants' general manager's wanton conduct). Finally, Brent's reliance on *Cerretti*, where the plaintiff alleged a CEO's failure to act in the face of a known danger, is therefore misplaced. 837 P.2d at 330. Unlike the plaintiff there, Brent has not identified a person "with express authority to act on behalf of" Walmart for Section 60-3702(d). *Walters*, 2021 WL 463370, at *4; *see also Goebel Walls v. MiraCorp, Inc.*, No. 09-2112, 2011 WL 3651346, at *7–8 (D. Kan. Aug. 18, 2011) (permitting punitive damages claim for alleged battery and sexual harassment committed by CEO of small business).

Brent's argument that Walmart gave employees and store managers so much discretion as to amount to ratification mischaracterizes the safety policies. Although the store managers had discretion in implementing specific safety policies, there is no evidence that the managers had "carte blanche authority" to run the stores as they saw fit or to disregard Walmart's safety policies. *Lindsey*, 984 P.2d at 724. Brent has not offered evidence that Walmart gave any employee "the right or authority" to ignore a dangerous wet floor or that Walmart approved or sanctioned such conduct. *See Stallings*, 598 F. Supp. 2d at 1215. Instead, the policies direct employees to take precautions in poor weather. They affirmatively require proactive steps to mitigate the risk of accidents, for example by placing mats and caution cones and by using shop vacs to remove excess water. There is no evidence that the policies are optional or simply suggestions.

Moreover, there is no evidence that Walmart was aware that the policies themselves were inadequate or that Walmart sanctioned a "course of causally related misconduct" over a time period leading up to Brent's fall. *See Smith*, 866 P.2d at 1004–05 ("[E]vidence that [employer] knew or should have known that [employee] was violating safety regulations, but did nothing to require his compliance, is relevant to authorization or ratification."). She has not alleged prior incidents that might have put Walmart on notice that accidents were imminent or highly likely to occur under its current safety policies. *See Stallings*, 598 F. Supp. 2d at 1215 (citing lack of evidence of prior incidents in finding no ratification by employer of truck driver's accident-causing conduct).

Finally, Brent claims that by allowing Lundholm to mop the floor immediately after the accident, manager McPherson approved a "cover[] up," which demonstrates ratification of the underlying conduct. Doc. 114 at 31. But Lundholm's mopping, even if against Walmart's policies and even if sanctioned by management, did not itself give rise to the conduct that resulted in Brent's fall. *See Smith*, 254 P.2d at 1004 ("We conclude that there must be a determination that

10

the corporate defendants authorized or ratified the conduct . . . that proximately caused the accident."). Lundholm's mopping did not cause Brent's accident. So here too, Brent's argument fails to raise a genuine dispute.

### III

For the reasons set forth above, Defendant's motion for partial summary judgment, Doc. 108, is granted.

It is so ordered.


Date: February 11, 2022            s/Toby Crouse
                                   Toby Crouse
                                   United States District Judge